**FOURTH DIVISION**
**DOYLE, P. J.,**
**ANDREWS and BOGGS, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)**
**http://www.gaappeals.us/rules/**

**June 28, 2012**

# In the Court of Appeals of Georgia

A12A0201. CROSSING PARK PROPERTIES, LLC et al. v. JDI
FORT LAUDERDALE, LLC.

BOGGS, Judge.

Crossing Park Properties, LLC and Joan and Glen Hammer[1] appeal from the trial court's order granting JDI Fort Lauderdale, LLC's ("JDI") motion to dismiss their complaint. In their sole claim of error on appeal, the appellants contend that the trial court erred by concluding that it lacked personal jurisdiction over JDI. For the reasons explained below, we agree and reverse.

In Georgia, defendants filing a motion to dismiss based upon a lack of personal jurisdiction bear the burden of proof. *Home Depot Supply v. Hunter Management*,

---

[1] This is not the first appearance of these parties before this court. In *Crossing Park Properties v. Archer Capital Fund*, 311 Ga. App. 177 (715 SE2d 444) (2011), we reversed the trial court's grant of summary judgment to JDI's co-defendant, Archer Capital Fund ("Archer"), and two of its related affiliates.

289 Ga. App. 286 (656 SE2d 898) (2008). "Where as here, the motion was decided on the basis of written submissions alone, any disputes of fact in the written submissions supporting and opposing the motion to dismiss are resolved in favor of the party asserting the existence of personal jurisdiction, and the appellate standard of review is nondeferential." (Citations, punctuation, and footnotes omitted.) Id.

Construed in favor of the appellants, the record shows that they filed suit against JDI based upon its actions in connection with a 2006 real estate transaction. It is undisputed that JDI is an Illinois limited liability company that is not and never has been authorized to conduct business in Georgia.

In 2005, Condominium Ventures of America, Inc. ("Condominium Ventures"), a Georgia corporation, and its associates[2] approached Glen Hammer about an opportunity to purchase property in Florida, refurbish it, form it into condominium units, and then resell the individual condominium units for a profit. According to the complaint, "[Condominium Ventures and its associates] proposed that Glen Hammer participate in the transaction by arranging the loans used to purchase and refurbish

---

[2] Georgia residents William Schmitt, Thomas Schmitt, and the late Kenneth Harris owned and operated Condominium Ventures.

2

the Florida Property. In exchange, [Condominium Ventures and its associates] proposed that Glen Hammer would be paid a fee."

In April of 2006, 2000 Ocean Drive, LLC ("2000 Ocean"), a Florida limited liability company, was created "for the purpose of being the purchaser of the Florida Property and the primary borrower of funds needed for the purpose of purchasing and refurbishing of the Florida Property." 2000 Ocean was formed by the Schmitts, Harris, Condominium Ventures, and TKW, a Georgia limited liability company.

Bank of America provided an initial loan of $13,500,000 for the downpayment on the purchase of the Florida property and other expenses associated with the project. It was an interim loan designed to be replaced by additional financing to be obtained in December of 2006 to complete the purchase of the property as well as the condominium conversion. Glen Hammer guaranteed the Bank of America loan in exchange for a promise by 2000 Ocean to pay him a fee. 2000 Ocean's promise was guaranteed by Condominium Ventures and its associates.

In October 2006, Mark Rowell, a broker with offices in Alpharetta, Georgia, began exchanging emails with JDI's senior vice president seeking a loan to complete the purchase of the Florida property. In one of these exchanges, Rowell mentions that Glen Hammer would be willing to sign "if needed," but the other participants in the

3

deal would prefer to do it without him because "his signature costs them $1M." According to JDI's vice president, "JDI did not initiate contact with Mr. Hammer, nor did it seek out Mr. Hammer's guaranty." Although the Hammers and Crossing Park were not directly involved in negotiating the terms of the loan, Hammer's guaranty ultimately became part of the transaction.

On December 1, 2006, JDI entered into a $40 million loan with 2000 Ocean for the purchase price of the property. The primary collateral for the loan was the Florida property. On the same day, Archer Capital Fund, L. P. gave a second priority $11 million loan to 2000 Ocean. All of the documents in connection with these loans were signed in Florida *except* those executed by the Hammers and Crossing Park in Georgia. The JDI loan guaranty and the JDI subordination agreement documents were sent to Hammer in Georgia from JDI's counsel in Florida, and the record includes email exchanges between Hammer and JDI's Florida counsel. The guaranty document drafted by JDI provides that notices shall be provided to Glen Hammer at his Norcross, Georgia address.

According to JDI's vice president, the loan guaranty signed by Hammer "terminated by its terms shortly after the closing"[3] and "JDI has never sought any recovery from Mr. Hammer." Additionally, "JDI never held a security interest in any of Plaintiffs' property." In the subordination agreement signed by Hammer, he agreed "to subordinate to JDI his interest in money owed to him by 2000 Ocean."

The obligees on the Archer second priority loan included 2000 Ocean, Crossing Park Properties, Joan Hammer, and TKW. Collateral for this loan included the Florida property, condominiums owned by Joan Hammer located in Georgia, an office park owned by Crossing Park located in Georgia, and Glen Hammer's interest in Crossing Park.

On the same day that the Hammers and Crossing Park executed their documents in connection with the JDI and Archer loans, JDI, Archer, and 2000 Ocean signed an additional subordination agreement ("Undisclosed Agreement"). The Hammers and Crossing Park contend that they were not informed of the Undisclosed Agreement which "altered the landscape of the deal" and "drastically and materially

---

[3] The guaranty provided that "if no Event of Default has occurred and at such time the guaranteed debt (as defined below) is less than the product of (A) the number of Unsold Units (as defined [in the Loan Agreement]) multiplied by (B) $315,000, then this Guaranty shall be terminated and the undersigned shall be released from all obligations hereunder."

5

increased" their personal risk in the event of default. It is undisputed that this document was executed in Florida.

In December of 2007, both the JDI and Archer loans were in default. In July 2008, JDI, 2000 Ocean, Condominium Ventures and its associates entered into an agreement to give JDI a deed to the Florida property in lieu of foreclosure. According to the Hammers and Crossing Park, the effect of this deed in conjunction with the Undisclosed Agreement left them as "the target for repayment of the Archer loan." They also assert that the value of the Florida property at the time the deed was given to JDI "exceeded the outstanding balances of the JDI loan and the Archer loan." Finally, they assert that as a result of the Undisclosed Agreement between JDI and Archer, Archer foreclosed upon the Georgia condominiums owned by Joan Hammer and the Georgia office park owned by Crossing Park.

On April 29, 2009, Glen Hammer filed suit in Florida against JDI, as well as other parties, and initially asserted only conversion and accounting claims against JDI in connection with three condominium units owned by Glen Hammer. On July 2, 2009, the Hammers and Crossing Park filed a suit in Georgia against JDI, Archer, 2000 Ocean, Condominium Ventures, TKW, the Schmitts, and the Estate of Kenneth Harris in connection with the December 1, 2006 transaction, asserting that the

6

defendants had committed fraud by failing to tell them about the Undisclosed Agreement. In a later amended complaint to the Georgia action, the Hammers and Crossing Park sought to rescind all documents executed by them in connection with the transaction based upon fraud, including all documents executed in connection with the JDI loan. They also asserted that they were entitled to damages based upon JDI's constructive fraud and breach of implied duty of good faith and fair dealing. On January 7, 2010, Glen Hammer amended his Florida complaint to add Archer as a defendant and also asserted for the first time a fraudulent inducement claim against JDI in connection with the Undisclosed Agreement.

JDI moved to dismiss the Georgia action based upon its contention that it does not have sufficient minimum contacts in Georgia for a Georgia court to exercise personal jurisdiction over it. The trial court granted the motion based upon its conclusion "that the fortuitous nature of where Plaintiffs executed the documents is not sufficient to confer 'minimum contacts' over JDI. There is no evidence that the location of Plaintiffs' execution of the documents in Georgia was directed or initiated by JDI." It also found that the documents executed by Glen Hammer in Georgia were "at best only tangentially related to the Plaintiffs' core claim, which concerns the JDI-Archer forbearance agreement. Neither party is claiming a breach of the above

agreements." Finally, the trial court found that because Glen Hammer had already initiated a suit in Florida against JDI asserting similar allegations, "it would not work a hardship upon him or the affiliated plaintiffs to pursue any remaining claims in the Florida litigation should they wish to do so."

In their sole enumeration of error on appeal, the Hammers and Crossing Park assert that the trial court erred by concluding it lacked personal jurisdiction over JDI. We agree.

Georgia's long-arm statute provides that a court may exercise jurisdiction over a nonresident if he personally, or through an agent, "[t]ransacts any business within this state." OCGA § 9-10-91 (1); *Paxton v. Citizens Bank & Trust*, 307 Ga. App. 112, 115 (704 SE2d 215) (2010). "[B]ecause this statutory language would expand the personal jurisdiction of Georgia courts beyond that permitted by constitutional due process," the Georgia Supreme Court has construed it to reach "only to the maximum extent permitted by procedural due process." (Citations and punctuation omitted.) *Innovative Clinical & Consulting Svcs. v. First Nat. Bank*, 279 Ga. 672, 675 (620 SE2d 352) (2005). In determining the limits of due process, we must apply the following three-part test:

[J]urisdiction exists on the basis of transacting business in this state if (1) the nonresident defendant has purposefully done some act or consummated some transaction in this state, (2) if the cause of action arises from or is connected with such act or transaction, and (3) if the exercise of jurisdiction by the courts of this state does not offend traditional fairness and substantial justice.

(Citations and punctuation omitted.) *Amerireach.com v. Walker*, 290 Ga. 261, 269 (2) (719 SE2d 489) (2011). We consider

the first two factors to determine whether a defendant has established the minimum contacts with the forum state necessary for the exercise of jurisdiction. If such minimum contacts are found, we move to the third prong of the test to consider whether the exercise of jurisdiction is reasonable — that is, to ensure that it does not result solely from random, fortuitous or attenuated contacts.

(Citation and punctuation omitted.) *Paxton*, supra, 307 Ga. App. at 116.

With regard to the first prong of the test, our Supreme Court has held that "nothing in subsection (1) [of the long-arm statute] requires the physical presence of the nonresident in Georgia or minimizes the import of a nonresident's intangible contacts with the State. [Cit.]" *Innovative Clinical &c. Svcs.*, 279 Ga. at 675. And the assertion of long-arm jurisdiction over non-resident defendants can be based upon business conducted through postal, telephonic, and Internet contacts. *Paxton*, supra,

9

307 Ga. App. at 116, 119 (1); *First National Bank v. Innovative Clinical &c. Svcs.*, 280 Ga. App. 337, 338 (634 SE2d 88) (2006). Moreover, "[a] single event may be a sufficient basis if its effects within the forum are substantial enough. Such a result may obtain whether or not the non-resident is physically present in the state." (Citation, punctuation and footnote omitted.) *Robertson v. CRI*, 267 Ga. App. 757, 760 (601 SE2d 163) (2004). With regard to guaranties,

> our inquiry is not limited to the execution of the guaranty contracts alone, as the contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction. It is these factors — prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing — that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.

(Citation, punctuation and footnotes omitted.) Id. at 761.

In this case, the record shows that JDI negotiated the transaction through a broker in Georgia, decided to require a guaranty from a Georgia resident, and sent loan documents to Glen Hammer in Georgia for the purpose of availing itself of his financial resources in Georgia to consummate the closing of the underlying transaction. Significantly, its decision to send closing documents to Georgia without

10

including the Undisclosed Agreement lies at the heart of Hammer's claims against JDI. Hammer contends he would not have entered into the transaction had he known about the Undisclosed Agreement, making the effect of JDL's conduct in sending incomplete documents to Glen Hammer in Georgia substantial, particularly when one of the consequences of the transaction as a whole was the foreclosure of real property in Georgia. And Hammer also seeks in his complaint to set aside the documents he executed in Georgia. Based upon all of these facts, we conclude that the first two prongs of the minimum contacts test have been fulfilled. *First Nat. Bank*, supra, 280 Ga. App. at 338; *Paxton*, supra, 307 Ga. App. at 116-121 (1) and (2).

"Our final step in the application of the three-part test is to determine whether the exercise of jurisdiction by a Georgia court in this case comports with traditional notions of fairness and substantial justice. Due process requires that individuals have fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign." (Citations and punctuation omitted.) *Noorani v. Sugarloaf Mills*, 308 Ga. App. 800, 804 (2) (c) (708 SE2d 685) (2011) (full concurrence in Div. 2). In this case, JDI's conduct in negotiating with a Georgia broker and sending documents to a Georgia resident for execution in Georgia provided fair warning that it might be subject to suit in Georgia, particularly when its decision to omit the Undisclosed

Agreement from the documents sent to Georgia forms the central basis of the claims against it. "Georgia has an interest, as does every state, in providing its own citizens with a convenient forum for redressing injuries wrought by nonresidents who have sought the state's citizens out for the purpose of business gain. [Cit.]" *First Nat. Bank*, supra, 280 Ga. App. at 338. And finally, the record shows that the particular claims at issue in this lawsuit were first brought in Georgia, not in Florida as alleged by JDI.[4] See *Booksing v. Holley*, 210 Ga. App. 869, 872 (2) (437 SE2d 857) (1993).

Based upon our conclusion that the trial court had personal jurisdiction over JDI pursuant to OCGA § 9-10-91 (1), we reverse its order granting JDI's motion to dismiss.

*Judgment reversed. Doyle, P. J. and Andrews, J., concur.*

---

[4] Joan Hammer and Crossing Park are not parties to the Florida action.